**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re Application of

FOURWORLD EVENT OPPORTUNITIES, LP
and GENESIS EMERGING MARKETS
INVESTMENT COMPANY

Petitioners, for an Order Pursuant to 28 U.S.C.
§ 1782 to Conduct Discovery for Use in a Foreign
Proceeding.

Case No. 21-

# MEMORANDUM OF LAW IN SUPPORT OF THE APPLICATION FOR AN ORDER OF JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

Duane L. Loft
Brianna S. Hills
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 446-2300
Facsimile: (212) 446-2380
dloft@bsfllp.com
bhills@bsfllp.com

Ira A. Schochet
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Telephone: (212) 907-0864
ischochet@labaton.com

Christine Mackintosh (*pro hac vice* application
forthcoming)
123 S. Justison Street
Wilmington, DE 19801
Telephone: (302) 622-7081
cmackintosh@gelaw.com

*Attorneys for Petitioners*

# TABLE OF CONTENTS

EX PARTE APPLICATION ................................................................................ 1

PRELIMINARY STATEMENT ......................................................................... 2

FACTUAL BACKGROUND .............................................................................. 5

    A.    Parties to the Foreign Proceeding ...................................... 5

    B.    The Merger ....................................................................... 5

    C.    The Merger's Unfair Price and Process ............................ 9

    D.    Petitioners' Cayman Islands Appraisal Proceeding ................ 11

    E.    Discovery in the Cayman Islands Appraisal Proceeding ........ 11

    F.    Respondents and the Discovery Sought ............................ 12

ARGUMENT ................................................................................................... 13

    I.    THE APPLICATION SATISFIES THE THREE STATUTORY
    REQUIREMENTS OF 28 U.S.C. 1782 ....................................... 14

    A.    Respondents "Reside" or Are "Found in" this District ............ 14

    B.    The Discovery Sought Is "For Use" In a Foreign Proceeding ....... 18

    C.    Petitioners Are "Interested Persons." .................................. 19

    II.    THE *INTEL* DISCRETIONARY FACTORS WEIGH IN FAVOR OF
    GRANTING DISCOVERY ........................................................ 19

    A.    Respondents Are Non-Participants in the Appraisal Proceeding. ........... 20

    B.    The Cayman Islands Court Will Be Receptive to the Evidence Sought ... 21

    C.    Petitioners Are Not Circumventing Foreign Proof-Gathering
    Restrictions. ........................................................................ 22

    D.    The Subpoenas Are Not Unduly Burdensome. ........................ 23

        1.    The Subpoenas Are Properly Limited in Scope ...................... 23

        2.    A Rule 30(b)(6) Deposition Is Appropriate Here. ................ 25

    III.    EXPEDITED COMPLIANCE WITH THE SUBPOENAS IS WARRANTED .. 25

# TABLE OF AUTHORITIES

**CASES**

*Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*,
   785 F.Supp.2d 434 (S.D.N.Y. 2011) .................................................................................. 19, 22

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
   673 F.3d 76 (2d Cir. 2012) ............................................................................................ 3, 18, 22

*CFTC v. Amaranth Advisors LLC*,
   554 F. Supp. 2d 523 (S.D.N.Y. 2008) ...................................................................................... 15

*de Leon v. Clorox Co.*,
   No. 19-MC-80296-DMR, 2020 WL 4584204 (N.D. Cal. Aug. 10, 2020) ............................. 17

*Euromepa, S.A. v. R. Esmerian, Inc.*,
   51 F.3d 1095 (2d Cir. 1995) ............................................................................................... 21, 24

*First Am. Corp. v. Price Waterhouse LLP*,
   154 F.3d 16 (2d Cir. 1998) ........................................................................................................ 24

*Gushlak v. Gushlak*,
   486 F. App'x 215 (2d Cir. 2015) ......................................................................................... 2, 22

*In re Accent Delight Int'l Ltd.*,
   869 F.3d 121 (2d Cir. 2017) ............................................................................................... 14, 18

*In re Accent Delight Int'l Ltd.*,
   No. 16-MC-125 (JMF), 2018 WL 2849724 (S.D.N.Y. June 11, 2018) ............................ 16, 25

*In re Appl. of Auto–Guadeloupe Investissement S.A., for an Order to Take Discovery Pursuant to 28 U.S.C. Section 1782*,
   No. 12 MC 221 (RPP), 2012 WL 4841945 (S.D.N.Y. Oct. 10, 2012) ................................... 21

*In re Appl. of Imanagement Servs. Ltd.*,
   No. Misc. 05-89 (FB), 2005 WL 1959702 (E.D.N.Y. Aug. 16, 2005) ................................... 23

*In re Appl. of OOO Promnefstroy for an Order to Conduct Discovery for Use in a Foreign Proceeding*,
   No. M 10-99 (RJS), 2009 WL 3335608 (S.D.N.Y. Oct. 15, 2009) ........................................ 21

*In re Appl. of Temporary Services Ins. Ltd.*,
   2009 WL 2843258 (W.D.N.Y Aug. 28, 2009) ........................................................................ 19

*In re Application of Athos Asia Event Driver Master Fund*,
   No. 4:21-MC-00153-AGF, 2021 WL 1611673 (E.D. Mo. Apr. 26, 2021) ............................. 22

*In re Application of Bloomfield Inv. Res. Corp.*,

315 F.R.D. 165 (S.D.N.Y. 2016) ........................................................................ 17

*In re Bayer AG*,
146 F.3d 188 (3d Cir. 1998) .............................................................................. 23

*In re del Valle Ruiz,*
939 F.3d 520 (2d Cir. 2019) ..................................................................... 5, 15, 23

*In re Ex Parte Application of Porsche Automobil Holding SE*,
No. 15-MC-417 (LAK), 2016 WL 702327 (S.D.N.Y. Feb. 18, 2016) ................... 25

*In re Gushlak*,
No. 11–MC–218 (NGG), 2011 WL 3651268 (E.D.N.Y. Aug. 17, 2011) .............. 24

*In re Letter of Request from Supreme Ct. of Hong Kong*,
138 F.R.D. 27 (S.D.N.Y. 1991) .......................................................................... 24

*In re Metallgesellschaft AG*,
121 F.3d 77 (2d Cir. 1997) ................................................................................ 23

*In re Mother's Milk, Inc.*,
No. 5:20–MC-00004–M, 2020 WL 2514315 (S.D.N.Y. May 15, 2020) ............... 25

*In re Nat. Gas Comm. Litig.*,
337 F. Supp. 2d 498 (S.D.N.Y. 2004) ................................................................ 15

*In re Penner*,
2017 WL 5632658 (D. Mass. Nov. 22, 2017) ..................................................... 22

*In re Petrobras Securities Litig.*,
393 F. Supp. 3d 376 (S.D.N.Y. 2019) ................................................................ 14

*In re Platinum Partners Value Arbitrage Fund L.P.*,
583 B.R. 803 (Bankr. S.D.N.Y. 2018) ................................................................ 21

*In re Top Matrix Holdings Ltd.*,
No. 18 MISC. 465 (ER), 2020 WL 248716 (S.D.N.Y. Jan. 16, 2020) .................... 5

*In re Top Matrix Holdings, Ltd.*,
2020 WL 248716 (S.D.N.Y. Jan. 16, 2020) ....................................................... 20

*In The Matter of Nord Anglia Education, Inc.*,
FSD 235 OF 2017 ......................................................................................... 4, 17

*Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004) .......................................................................................... 3

*Marubeni Am. Corp. v. LBA Y.K.*,
No. 08-3282-CV, 335 F. App'x 95 (2d Cir. June 17, 2009) ................................ 14

iii

*Mees v. Buiter*,
　793 F.3d 291 (2d Cir. 2015) ...................................................................................... 14, 18, 19

*Pfaff v. Deutsche Bank AG*,
　No. 20 Misc. 25 (KPF), 2020 WL 3994824 (S.D.N.Y. July 14, 2020) ............................ 15, 16

*Qihoo 360 Technology Co., Ltd.*,
　(unreported, October 9, 2017 CICA) .................................................................................. 19

*S.E.C. v. Alexander*, No. 00 Civ. 7290 (LTS),
　2003 WL 21196852 (S.D.N.Y. May 20, 2003) .................................................................... 16

*S.E.C. v. Credit Bancorp, Ltd.*,
　194 F.R.D. 469 (S.D.N.Y. 2000) ........................................................................................ 17

*Strike 3 Holdings, LLC v. Doe*,
　No. 20–cv–7923 (LJL), 2020 WL 5992346 (S.D.N.Y. Oct. 9, 2020) .................................... 24

*United States v. Stein*,
　488 F. Supp. 2d 350 (S.D.N.Y. 2007) ................................................................................ 17

**STATUTES**

28 U.S.C. § 1782 ................................................................................................................ 1, 2, 26

## EX PARTE APPLICATION

FourWorld Event Opportunities, LP and Genesis Emerging Markets Investment Company ("**Petitioners**") respectfully submit this *ex parte* application pursuant to 28 U.S.C. § 1782 (the "**Application**") seeking an order: (a) granting Petitioners leave to serve subpoenas (the "**Subpoenas**") on Respondents,[1] pursuant to Section 1782; (b) directing Respondents to produce the materials described in the Subpoenas within thirty days of service of the Subpoenas; (c) directing Respondents to provide witnesses to appear for Rule 30(b)(6) depositions in compliance with the Subpoenas on a mutually agreeable date within a reasonable time after Respondents' confirmation of the final production of documents in response to the Subpoenas; and (d) granting any and all other relief the Court deems just and proper.

Proceeding *ex parte* under Section 1782 is appropriate here.  As the Second Circuit has recognized, Section 1782 applications are commonly granted *ex parte* because "[t]he respondent's due process rights are not violated because he can later challenge any discovery request by moving to quash pursuant to Federal Rule of Civil Procedure 45(c)(3)."  *Gushlak v. Gushlak*, 486 F. App'x

---

[1] General Atlantic LLC ("GA LLC"), General Atlantic Singapore Fund Pte. Ltd. ("GASF"), GASF Interholdco Ltd. ("GASF Interholdco"), General Atlantic Partners (Bermuda) III, LP ("GAP Bermuda III"), General Atlantic Partners (Bermuda) IV LP ("GAP Bermuda IV"), Inc., General Atlantic GenPar (Bermuda) LP ("GA GenPar"), GAP (Bermuda) Ltd. ("GAP Bermuda Ltd."), GAP Coinvestments III LLC ("GAPCO III"), GAP Coinvestments IV LLC ("GAPCO IV"), GAP Coinvestments V LLC ("GAPCO V"), GAP Coinvestments CDA LP ("GAPCO CDA"), General Atlantic Singapore 58 Pte. Ltd. ("GAS 58"), and General Atlantic Singapore 58TP Pte. Ltd. ("GAS 58TP" and, together, "General Atlantic" or "General Atlantic Entities") as well as Warburg Pincus LLC ("WP LLC"), Warburg Pincus China-Southeast Asia II (Cayman) LP ("WP Asia II"), Warburg Pincus China-Southeast Asia II-E (Cayman) LP ("WP Asia II-E"), WP China-Southeast Asia II Partners (Cayman) LP ("WP Asia II Partners"), Warburg Pincus China-Southeast Asia II Partners LP ("Warburg Asia II Partners"), Warburg Pincus (Callisto) Global Growth (Cayman) LP ("WP Callisto"), Warburg Pincus (Europa) Global Growth (Cayman) LP ("WP Europa"), Warburg Pincus Global Growth-B (Cayman) LP ("WPGB"), Warburg Pincus Global Growth-E (Cayman) LP ("WPGE"),  WP Global Growth Partners (Cayman) LP ("WPG Partners"), and Warburg Pincus Global Growth Partners (Cayman) LP ("Warburg Growth Partners"), and Polarite Gem Holdings Group, Ltd. ("Polarite" and, together, "Warburg Pincus" or "Warburg Pincus Entities").

1

215, 217 (2d Cir. 2015) ("[I]t is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*.").  Petitioners therefore respectfully ask the Court to grant the Application, allow for service of the Subpoenas, and provide Respondents an opportunity to respond and raise any objections to the Subpoenas after they are served.

## PRELIMINARY STATEMENT

Petitioners respectfully submit this Application pursuant to 28 U.S.C. § 1782 to take limited discovery from corporations found in this District for use in connection with an appraisal proceeding filed in the Grand Court of the Cayman Islands (the "**Cayman Court**") on November 10, 2020 (the "**Appraisal Proceeding**").  In the Appraisal Proceeding, Petitioners (along with other dissenting shareholders) seek a determination of the fair value of their shares in 58.com ("**58.com**" or the "**Company**"), a Cayman Islands company that was delisted from the public exchanges, including the New York Stock Exchange, and taken private on September 17, 2020. Petitioners' shares were forcibly canceled through a merger orchestrated by the company's CEO and several private-equity funds (the "**Merger**").

The Merger was coercive and fundamentally unfair to minority shareholders, both with respect to the Merger price, which significantly undervalued 58.com's shares, and the process to approve the Merger.  The Merger capitalized on a temporary decline in 58.com's trading prices during the COVID-19 pandemic.  No effort was undertaken to shop the Company to competing bidders to ensure that 58.com shareholders received fair value for their shares.  And the Merger was orchestrated by majority shareholders—including the Company's founder and CEO—without the consent of a substantial amount of minority shareholders, who were offered inadequate consideration for their shares.

Through this Application, Petitioners seek narrowly tailored discovery from Respondents

for use in the Appraisal Proceeding.  Respondents are private equity funds that were part of the Buyer Group (defined below) that took 58.com private and orchestrated the delisting of publicly-traded securities from the New York Stock Exchange.  Respondents played a critical role in negotiating the terms of the Merger with 58.com and its board of directors.  Petitioners seek discovery from these private equity firms concerning the negotiation process leading up to the Merger and the fair value of 58.com's shares—the core issues in the Appraisal Proceeding, in which the Cayman Court will determine the fair value of Petitioners' shares.

Section 1782 authorizes this Court to order discovery from any person or entity that resides or is found in this district to assist with pending or contemplated proceedings before foreign tribunals.  Section 1782's broad applicability and "modest prima facie elements" reflect "Congress's goal of providing equitable and efficacious discovery procedures."  *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012) (internal quotes omitted).  As described below, Petitioners' Application meets all of the statutory requirements of Section 1782: (i) the Respondents "reside" or are "found" in the Southern District of New York because they are either headquartered in this District or subject to specific personal jurisdiction in this District based on their involvement in a transaction that delisted securities from the New York Stock Exchange; (ii) the requested discovery is "for use" in a foreign proceeding, namely the Appraisal Proceeding; and (iii) Petitioners, as claimants in the Appraisal Proceeding, easily meet the standard for an "interested person" under the statute.  In addition, each of the Supreme Court's factors that guide this Court's exercise of discretion under Section 1782 weigh decisively in favor of granting Petitioners' Application.  *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264, 124 S. Ct. 2466, 2482, 159 L. Ed. 2d 355 (2004) ("*Intel*").

*First*, Petitioners seek discovery from a "nonparticipant" in the foreign action.  *Id.*  None

of the Respondents is a party in the Appraisal Proceeding or otherwise subject to the jurisdiction of the Cayman Court.

*Second*, there is no indication, let alone the required "authoritative proof," suggesting that the Cayman Court might be unreceptive to Section 1782 assistance.  *Id.*  To the contrary, as established in the accompanying expert declaration of Justice Ingrid Mangatal (Ret'd), Petitioners will have the right to present evidence gathered under Section 1782 to the Cayman Court in support of their claims.  Indeed, as made clear in a recent Cayman Islands appraisal decision, *In The Matter of Nord Anglia Education, Inc.,* FSD 235 OF 2017,[2] the Cayman Court will accept and consider the evidence sought here given its critical importance in determining the fair value of the shares.

*Third,* the Application is not concealing any improper attempt to circumvent any foreign discovery restrictions on proof gathering.  *Intel*, 542 U.S. at 264.  The requested discovery does not implicate any privilege or special protection that would make it improper under Cayman Islands law.

*Fourth*, the proposed discovery is not unduly burdensome.  *Id.*  To the contrary, the Subpoenas are narrowly tailored to seek information directly relevant to the critical issues in the Appraisal Proceeding—namely (a) the actions taken by Respondents as members of the Buyer Group in connection with the transaction; (b) the valuation of the Company; and (c) any relationship between the Respondents and (i) Li (Lily) Dong and (ii) Robert Dodds, Jr., the members of the Special Committee that approved the transaction.

*Finally*, the physical location of the requested discovery should not restrict the scope of discovery permitted under this Application.  Under the Second Circuit's decision in *In re del Valle Ruiz*, Section 1782 is extraterritorial in reach, and there is no bar on discovery located outside of

---

[2] A copy of the decision is attached as Exhibit 1 to the expert declaration of Judge Mangatal.

U.S.  Nor should the location of evidence influence the Court's discretion here.  Where, as here, none of the Petitioners are party to the Appraisal Proceeding, courts commonly exercise their discretion to order discovery of evidence located abroad.  *See, e.g.*, *In re del Valle Ruiz,* 939 F.3d 520, 533–34 (2d Cir. 2019); *In re Top Matrix Holdings Ltd.*, No. 18 MISC. 465 (ER), 2020 WL 248716, at *5 (S.D.N.Y. Jan. 16, 2020).

## FACTUAL BACKGROUND

### A.    Parties to the Foreign Proceeding

Petitioners are funds that invested in 58.com and owned 58.com shares immediately before the effective date of the Merger that is the subject of Appraisal Proceeding.  *See* Declaration of Marc Kish in Support of Petitioners' Application ("Kish Decl.") ¶ 2.  Petitioners are respondents in the Appraisal Proceeding.  *Id.* ¶ 2.  Before the Merger, 58.com—China's largest online classifieds business—was a publicly traded corporation incorporated in the Cayman Islands.  *Id.* ¶ 10.  The Company's American Depository Shares ("**ADS**") were traded on the New York Stock Exchange.  *Id.* ¶ 11.  Jinbo Yao, the Company's CEO and founder, historically maintained significant control over the voting shares of 58.com.  *Id.* ¶ 12.

### B.    The Merger

On June 15, 2020—three months after the world was plunged into the COVID-19 global pandemic, which had a temporary negative impact on the demand for the Company's online classifieds services and thus its share price—the Company announced that it had entered into a merger agreement through which 58.com would be acquired by Mr. Yao along with a consortium of private equity funds (the **"Buyer Group"**).  *Id.* ¶ 15.  In addition to Mr. Yao, the Buyer Group also included funds wholly owned and controlled by Warburg Pincus LLC and General Atlantic LLC—two New York-based private equity firms—along with Ocean Link Partners L.P., a China-based private equity firm.  As noted, through Mr. Yao, the Buyer Group collectively controlled

over 44% of the Company's voting shares as of August 7, 2020.  *Id.* ¶ 12.

The announcement stated that on the effective date of the Merger, 58.com's publicly traded ADS—equity shares of a foreign company held by a U.S. depositary bank available for purchase by U.S. investors—would be canceled in exchange for the right to receive $56 per ADS.  *Id.* ¶ 17. Under the terms of the Merger, 58.com was to become a wholly-owned subsidiary of a company called Quantum Bloom Group Ltd, which would be beneficially owned by the Buyer Group, including Mr. Yao, Warburg Pincus, General Atlantic, Ocean Link, and others.  *Id.* ¶.

Notably, other principal shareholders of the Company, including Tencent Holdings Ltd. (the **"Rollover Shareholders"**), controlled over 28.26% of the voting shares of 58.com.  *Id.* ¶ 13. It was explicitly agreed under the terms of the Merger that shares held by the Rollover Shareholders would <u>not</u> be cancelled in exchange for the Merger price.  Rather, shares held by the Rollover Shareholders would be converted into shares of the new private entity (and their pro-rata equity interest increased from 22.44% to 33.25%, giving Rollover Shareholders a significant financial benefit).

The lead-up to the Merger announcement was characterized by a flawed process designed to engineer the management buyout desired by Mr. Yao and his private equity partners.  On March 24, 2020, the Company engaged Kaihui Limited (**"KL"**) as its consultant to explore strategic transactions.  On April 2, 2020, KL contacted Ocean Link; incredibly, that very evening, Ocean Link submitted a proposal to acquire all the outstanding shares of the Company at $55 per share. The Company then decided to create a Special Committee of independent board members, which would be tasked with considering the Merger.  However, there were <u>no</u> independent board members at the time.  The Company consequently appointed two new board members: Li (Lily)

Dong and Robert Frank Dodds, Jr. who, together, comprised the entire Special Committee.[3]

The Special Committee approved the engagement of Houlihan Lokey (China) Limited. (**"Houlihan Limited"**) as its financial advisor.  At the request of the Special Committee, the Company began preparing updated financial projections "for use by [Houlihan Limited] in connection with its financial analysis."  Kish Decl., Ex. B at 29.  These projections were created under the watch of the Company management who had an obvious incentive to underestimate the Company's financial prospects.  Indeed, Houlihan Limited's valuation presentation indeed shows the Company management's profit projection was uniformly lower than projections of all nine Wall Street analysts, who followed the Company closely.[4]  On May 21, 2020, the Special Committee, while purportedly comprised of independent directors, nonetheless declined to either conduct a "market check"—that is, contacting potential bidders for control of 58.com—or to insist on negotiations with the Buyer Group for the right to conduct a "go-shop," a procedure by which 58.com would be permitted to solicit competing bids.  The Buyer Group's bid was never tested in the market, and shareholders lost all benefit of a competitive process to determine the actual market value of their shares.

Other features of the Merger process give rise to significant concern.  The Special Committee treated KL as its advisor and agent throughout its negotiations with the Buyer Group, even though KL was hired by the same members of the Company's management that would later propose the transaction as part of the Buyer Group.  Ultimately, the Special Committee and the

---

[3] Ms. Dong and Mr. Dodds were appointed after the resignation of Frank Lin, an independent director who had served on the Company's board for over ten years.  Despite deeming Ms. Dong and Mr. Dodds to be independent directors, the Company never disclosed Ms. Dong's and Mr. Dodd's preexisting relationships to the Company management or their relationships to the members of the Buyer Group.

[4] August Proxy Statement, Ex. (c)-(2), Houlihan Limited Presentation (June 12, 2020), at 23.

Buyer Group agreed to a purchase price of $56 per share, but only after removing a critical protection that would have required approval by a majority of the minority shareholders (the **"MoM Condition"**) to protect minority shareholder rights, making the approval of the transaction almost certain regardless of support from the minority shareholders. The negotiation process took only 74 days, and the price negotiation only lasted 10 days, a staggeringly rushed timeline designed to undervalue the Company and squeeze out minority shareholders.

The Merger announcement led to immediate concern expressed by minority shareholders and independent industry commentators. In June 2020, minority shareholder Aberdeen Standard Investments Ltd. wrote a letter to the SEC urging the agency to bar interested parties from voting on the proposal.[5] On August 26, 2020, Institutional Shareholder Services ("ISS"), a well-respected proxy-advisory firm, published a report opposing the transaction, stating "[t]he process that led to the buyer group's offer was flawed and the result of that process is questionable." ISS also performed its own financial analysis that showed "[t]he value offered to shareholders is out of sync with the company's historical valuation relative to peers."[6]

On September 7, 2020, the Company held an extraordinary general meeting of shareholders (the "**EGM**"), at which time 58.com shareholders voted on whether to approve the Merger. *Id.* ¶ 25. Only 15% of all shareholders that were unaffiliated with either the Buyer Group or the Rollover Shareholders voted in favor of the transaction. Despite such widespread opposition from the unaffiliated shareholders,[7] the transaction was forced through, given the lack of MoM: 61% of the Class A and Class B shareholders attended the EGM (which represented approximately 65% of the total outstanding votes), and the Merger was approved by over 75% of the total votes that

---

[5] *See* Loft. Decl. Ex. 34.
[6] *See* Loft. Decl. Ex. 35.
[7] Notices of objection were delivered by shareholders of at least 70,524,198 shares.

were cast, with the Rollover Shareholders themselves surprisingly opting to abstain. *Id.* Accordingly, Petitioners' shares and the shares of all remaining stockholders—other than Members of the Buyer Group—were canceled in exchange for the Merger consideration effective September 17, 2020, at a price Petitioners allege is substantially below their fair value. *Id.* ¶ 16.

## C.    The Merger's Unfair Price and Process

As alleged in the Appraisal Proceeding, the Merger price significantly undervalued 58.com shares and was coercive and unfair to 58.com's minority shareholders. *First*, the Merger was timed to capitalize on a temporary depression in 58.com's trading prices associated with the pandemic. The proposed buyout price of $56 per share is dramatically below 58.com's pre-pandemic trading prices. Indeed, on January 16, 2020—immediately before the recent market-wide decline associated with coronavirus—58.com's NYSE-listed ADS closed at over $69 per share. *Id.* ¶ 31.

*Second*, as noted, the Merger did not contain a MoM Condition to protect 58.com's minority shareholders. Incredibly, the Special Committee agreed to waive this critical protection in exchange for a mere $1 increase of the proposed purchase price and the removal of an option to not progress with the Merger based on the number of shareholders exercising dissent rights. Without MoM protection, the deal was a foregone conclusion because the Buyer Group collectively controlled the majority of the Company's voting shares.

*Third*, the process to approve the Merger was flawed. The Special Committee made no effort to conduct a proper competitive sale process and thus allowed the Buyer Group and Rollover Shareholders to cash out the Dissenting Shareholders at a depressed price. Faced with a Buyer Group that controlled such a large number of the Company's shares and that was led by the CEO, the Special Committee did not solicit a single additional bid, did not conduct a "market check," and did not insist on a "go-shop" provision—all standard features of a legitimate sale process

intended to protect minority shareholders.[8]   The Special Committee was also responsible for negotiating away the critical MoM protection mentioned above.  *Id.* ¶ 24.

*Fourth*, the Merger was structured such that all shares *other than* those held by the Buyer Group and the Rollover Shareholders were to be cashed out through the Merger.  Neither would be losing their stake in the Company and its valuable business in return for receiving only the $56 Merger consideration.  In fact, while the Rollover Shareholders did not buy additional shares in the Company, by simply rolling over their shares their pro rata equity increased from 22.44% to 32.25%.  Thus, the Rollover Shareholders had every reason to allow the Merger to proceed, at the expense of minority shareholders.   And the Buyer Group, with the help of the Rollover Shareholders, could push the Merger through with over 75% of the voting shares cast.  *Id.* ¶ 25.

*Fifth*, the fact that Mr. Yao—the Company's longtime controlling shareholder, founder, Chairman, and CEO—helped orchestrate the Merger at a depressed price indicates the Merger was essentially a management buyout of 58.com and further shows the Company was taken private to enrich those in control of the Company at the expense of minority shareholders.  Despite Mr. Yao's fiduciary obligation to steward the Company for the benefit of all shareholders, he teamed up with private equity funds to buy the Company for his own benefit while its trading price was depressed during the pandemic.  *Id.* ¶ 31.

*Finally*, under the terms of the Merger Agreement, in the event the Company received an unsolicited alternative bid of greater value (a "**Superior Proposal**"), the Buyer Group had unlimited match rights.[9]  To be able to accept a Superior Proposal, the Company and the board had to, among other things, provide the Buyer Group with an opportunity to match or exceed the

---

[8] *See* August Proxy Statement at 30.
[9] *See id.* at 107.

competing bid and pay a termination fee of $126,400,000.[10]   Under those circumstances, any bidder understood that the Buyer Group—which included senior 58.com management with exclusive inside knowledge of the Company—would likely match each of its bids up to the fair value of the Company, causing such a bidder to risk, if it won, overpaying for the 58.com shares. These onerous requirements essentially guaranteed the Merger would be unchallenged by any competing bid, and severely deterred any potential bidders from making a bid in the first place.

### D.       Petitioners' Cayman Islands Appraisal Proceeding

Under Section 238 of the Companies Act, the Cayman Court in the Appraisal Proceeding has a statutory obligation to determine the fair value of the dissenting shareholders' shares.   As described in the accompanying declaration of Judge Mangatal (the "**Mangatal Declaration**"), the parties to the Appraisal Proceeding—including the Petitioners and 58.com—will submit evidence, expert testimony, and legal briefs to the Cayman Court, which will weigh the evidence and determine the fair value of Petitioners' shares.  *See* Mangatal Decl. ¶ 17.

In assessing fair value in a Cayman Islands Appraisal Proceeding, the Cayman Court will examine the fairness (or lack thereof) of the process that led 58.com's board to approve the Merger. In doing so, the Cayman Court will consider the fairness of the Merger to 58.com's minority stockholders and will likely focus on, among other things, the process by which the 58.com board and/or Special Committee negotiated and approved the Merger price, and the valuations relied upon by the 58.com Special Committee and the Buyer Group.

### E.       Discovery in the Cayman Islands Appraisal Proceeding

As set forth in detail in the Mangatal Declaration, there is no automatic right to discovery in Section 238 proceedings similar to pre-trial discovery in the United States.  Instead, only upon

---

[10] *See id.* at 108, 115

Court order is a party to the proceeding required to provide discovery of "documents which are in their possession, custody or power relating to any matter in question between them in the action." Mangatal Decl. ¶ 31 (citing Grand Court Rules ("GCR") Order 24 rule 3).  Discovery of non-parties, particularly those like Respondents that are outside the Court's jurisdiction, is very limited, subject to cumbersome procedures, and rarely used.  *Id.* ¶ 42.

Nevertheless, Cayman Courts remain receptive to evidence obtained through other judicial measures such as 28 U.S.C. § 1782.  Indeed, as explained by Judge Mangatal, "Cayman courts have had the opportunity to consider specifically the use of 28 U.S.C. §1782 in connection with Cayman Islands proceedings and have held that it is permissible for a litigant in a Cayman Islands proceeding to exercise any rights it may have under 28 U.S.C. § 1782 to obtain relevant evidence for use in proceedings in the Cayman Islands."  *Id.* ¶ 54.  All relevant evidence obtained through this Application will thus be admissible in the Cayman Court.  *Id.* ¶ 66.

Furthermore, Cayman Islands courts expect the parties to obtain the evidence they believe is necessary to prosecute their case.  *Id.* ¶ 65.  There is no requirement to obtain permission from a Cayman Islands court before seeking relevant evidence abroad in the U.S. under 28 U.S.C. §1782.  *Id.*  In any event, at the very first scheduling conference (termed a "Directions Hearing") in the Appraisal Proceeding to be heard on 26-27 July 2021, Petitioners intend to inform the Cayman Court of the filing of this Section 1782 Application.  *See* Kish Decl. ¶ 39.

## F.    Respondents and the Discovery Sought

Respondents are funds wholly controlled by General Atlantic and Warburg Pincus, each of which was a member of the Buyer Group.[11]  General Atlantic Entities have their principal place of

---

[11] *See id.* at i.

business at 55 East 52nd Street, 32nd Floor, New York, NY 10055.[12]  Warburg Pincus Entities have their principal place of business at 450 Lexington Ave, New York, NY 10017.[13]

Petitioners seek limited discovery from the Respondents, targeted at issues central to the Appraisal Proceeding.  Respondents played a central role in negotiating the terms of the Merger and the ultimate Merger price.  *See* Declaration of Duane L. Loft in Support of Application ("**Loft Decl.**"), Ex. 27.  For example, SEC filings describe how Respondents together with Ocean Link and General Atlantic reached out to CEO Jinbo Yao to form a consortium to purchase 58.com and negotiated all of the terms of the Merger with 58.com and its board.  Loft Decl., Ex. 27.

Petitioners' Section 1782 Application therefore seeks discovery from Respondents concerning: (a) the actions taken by Respondents as members of the Buyer Group in connection with the transaction; (b) the valuation of the Company; and (c) any relationship between the Respondents and (i) Li (Lily) Dong and (ii) Robert Dodds, Jr., the members of the Special Committee that approved the transaction").  The Requested Discovery will significantly assist the Cayman Court in its evaluation of the Merger and determination of the fair value of the Petitioners' shares in 58.com.  *See* Kish Decl. ¶¶ 33-34; Mangatal Decl. ¶ 17.

## <u>ARGUMENT</u>

Section 1782 of Title 28 of the United States Code permits United States district courts to

---

[12] The General Atlantic Entities are GA LLC, GASF Interholdco, GAP Bermuda III, GAP Bermuda IV, GA GenPar, GAP Bermuda Ltd, GAPCO III, GAPCO IV, GAPCO V, and GAPCO CDA.  *See* Loft Decl., Ex. 28 (58.com Inc., SEC Schedule 13D (June 23, 2017), at 13 ("The principal address of each of the Reporting Persons [is] 55 East 52nd Street, 32nd Floor, New York, NY 10055.")); *see also id.* (defining "Reporting Persons" as including Respondents above).

[13] The Warburg Pincus Entities are WP LLC, WP Asia II, WP Asia II-E, WP Asia II Partners, Warburg Asia II Partners, WP Callisto, WP Europa, WPGB, WPGE, WPG Partners, Warburg Growth Partners, and Polarite.  *See* August Proxy Statement at 2 ("The business address and telephone number of each of WP SPV and the Warburg Entities is . . . 450 Lexington Ave, New York, NY 10017"); *see also id.* at i (defining "WP SPV" and "Warburg Pincus Entities" as including the named Respondents above).

grant discovery for use in a pending foreign proceeding or a foreign proceeding. *Intel* 542 U.S. at 243. An application under Section 1782 must satisfy three statutory requirements: (1) the discovery is sought from someone who resides or is found within the District; (2) the discovery is for use before a foreign tribunal; and (3) the applicant is an "interested person." *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 128 (2d Cir. 2017).

If these statutory requirements are met, the court then considers four discretionary "*Intel*" factors: (1) whether the person from whom discovery is sought is a "nonparticipant in the matter arising abroad"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance;" (3) whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States;" and (4) whether the request is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 264–65. None of these factors should be given more weight than the others, and no one factor is dispositive. *See Marubeni Am. Corp. v. LBA Y.K.*, No. 08-3282-CV, 335 F. App'x 95, 97 (2d Cir. June 17, 2009). Indeed, in considering these factors, the court is required to keep in mind "the twin aims of Section 1782: providing efficient assistance to participants in international litigation, and encouraging foreign countries by example to provide similar assistance to our courts." *Mees v. Buiter*, 793 F.3d 291, 298 (2d Cir. 2015) (quotations and citations omitted).

I.    **The Application Satisfies the Three Statutory Requirements of 28 U.S.C. 1782.**

Petitioners satisfy the three threshold statutory requirements of Section 1782.

A.    **Respondents "Reside" or Are "Found in" this District.**

Section 1782's first statutory element—that an entity "reside or be found" in a district—is satisfied when the entity is headquartered in the state. *See In re Petrobras Securities Litig.*, 393 F. Supp. 3d 376, 382 (S.D.N.Y. 2019) (concluding that the Court "should apply a personal

jurisdiction analysis to determine whether [a corporation] is 'found' in the district for the purposes of the § 1782 motion" and that "[a] corporation is subject to the general personal jurisdiction of the courts in the states of its incorporation and its principal place of business.").

Under *Valle Ruiz*, "found in" pursuant to Section 1782 is also coextensive with specific personal jurisdiction. *Valle Ruiz*, 939 F.3d at 527–528 (holding that "resides or is found" in Section 1782 "extends to the limits of personal jurisdiction consistent with due process," not merely general personal jurisdiction). This District recently held that activity related to securities or commodities that trade on a New York-based exchange subjects a foreign entity to specific jurisdiction, which satisfies Section 1782's "found in" requirement. In *Pfaff v. Deutsche Bank AG*, No. 20 Misc. 25 (KPF), 2020 WL 3994824 (S.D.N.Y. July 14, 2020), the court granted Section 1782 discovery of two foreign banks—both incorporated and headquartered in Germany—finding that they were subject to specific personal jurisdiction due to their "purposeful" "use [of] the precious metals markets in New York to conduct their business." *Id.* at *9 (internal citations and quotations omitted); *see also id.* at *10 ("While Petitioner does not contend that Moving Respondents executed their trades from New York, the trades for which Petitioner seeks discovery, occurred largely through COMEX, which operates in New York, New York.") (collecting cases).

In addition, courts rule that an indirect connection to an exchange—that is, a connection short of placing trades on an exchange oneself—suffices to establish specific personal jurisdiction as well. *See In re Nat. Gas Comm. Litig.*, 337 F. Supp. 2d 498, 517 (S.D.N.Y. 2004) (jurisdiction exists over out-of-state defendant whose out-of-state acts, i.e., executing wash trades on a Texas-based internet system, affected prices on the New York Mercantile Exchange); *CFTC v. Amaranth Advisors LLC*, 554 F. Supp. 2d 523, 530 (S.D.N.Y. 2008) (jurisdiction exists over out-of-state defendant who "directed [out-of-state] traders under his supervision to place orders . . . on

NYMEX"); *S.E.C. v. Alexander*, No. 00 Civ. 7290 (LTS), 2003 WL 21196852, at *2 (S.D.N.Y. May 20, 2003) (same for a Greek citizen residing in Greece who carried out his trades on the New York Stock Exchange from Greece by telephone through a Greek brokerage firm).

Under these standards, all Respondents are found in this District. Almost all of them list a principal corporate address in New York City, and are thus "found" in this District as a matter of general personal jurisdiction. For the three remaining Respondents that list a corporate address outside of this District—GASF, GAS 58, and GAS 58TP—those Respondents are subject to specific personal jurisdiction in this Court in connection with the requested discovery. As participants of the Buyer Group, Respondents took purposeful actions in connection with the delisting of publicly traded ADS from the New York Stock Exchange, an exchange located in New York. Under *Pfaff*, it is of no moment whether these purposeful actions were initiated from a foreign country. *Pfaff*, 2020 WL 3994824, at *10 n.8 (noting that the respondent banks never initiated trades from the U.S. but rather from their offices in Singapore; London; and Frankfurt, Germany). Under *Natural Gas Commodities Litigation*, *Amaranth*, and *Alexander*, it is also of no moment whether these purposeful actions involved financial intermediaries. *See, e.g.*, *Alexander*, 2003 WL 21196852, at *3 (the involvement of an intermediary brokerage firm irrelevant where it had "serious effects that can reasonably be expected to be visited upon United States shareholders"). Accordingly, all Respondents are "found in" this District.

Alternatively, if specific personal jurisdiction is found lacking for any Respondent, evidence in their possession nevertheless remains discoverable from their corporate parents headquartered in this District. Section 1782 "explicitly empowers courts to allow discovery to be taken and produced in accordance with the Federal Rules of Civil Procedure." *In re Accent Delight Int'l Ltd.*, No. 16-MC-125 (JMF), 2018 WL 2849724, at *4 (S.D.N.Y. June 11, 2018), *aff'd*, 791

F. App'x 247 (2d Cir. 2019).  Under Rule 45, a non-party may be required to produce for discovery materials which are in the non-party's 'possession, custody, or control.'" *In The Matter of Nord Anglia Education, Inc.,* FSD 235 OF 2017.  For example, Respondent GASF, headquartered in Singapore, is a direct subsidiary of Respondent GASF Interholdco, which is domiciled in this District.[14]  This gives rise to the strong presumption that GASF Interholdco has access to and control over any evidence in the hands of GASF and thereby GAS 58 and GAS 58TP.[15]  *See S.E.C. v. Credit Bancorp*, *Ltd.*, 194 F.R.D. 469 at 471–72 (S.D.N.Y. 2000) ("Courts have found control by a parent corporation over documents held by its subsidiary"); *In re Application of Bloomfield Inv. Res. Corp.*, 315 F.R.D. 165 (S.D.N.Y. 2016) (granting motion to compel against investment advisor and manager seeking information related to subsidiary); *United States v. Stein*, 488 F. Supp. 2d 350, 361 (S.D.N.Y. 2007) ("Parent corporations have been compelled to produce documents in the hands of subsidiaries, [and] subsidiaries documents in the hand of their parents entities."); *de Leon v. Clorox Co.*, No. 19-MC-80296-DMR, 2020 WL 4584204, at *4 (N.D. Cal. Aug. 10, 2020) ("[Respondent's] subsidiaries are majority shareholders who control the day-to-day operations of the ventures, and Ms. de Leon therefore seeks documents that are in [Respondent's] 'possession, custody, or control.'").

"Control" has also "been construed broadly by the courts" in this District "as the legal right, authority, or practical ability to obtain the materials sought upon demand."  *Credit Bancorp*, 94 F.R.D. at 471–72; *see also id.* ("This principal applies where discovery is sought from one corporation regarding materials which are in the physical possession of another, affiliated

---

[14] GASF Interholdco is the majority shareholder of GASF, owning 98.79% of outstanding ordinary shares and 98.71% of outstanding preference shares.  *See* Loft Decl. Ex. 30.
[15] GAS 58 and GAS 58TP are wholly-owned direct subsidiaries of GASF.  *See* Loft Decl. Ex. 31; Loft Decl. Ex. 32.

corporation . . . .  One of the circumstances which warrants a finding of control is where a corporate entity has the ability in the ordinary course of business to obtain documents held by another corporate entity.").   Public disclosures on Singapore's Account and Corporate Regulatory Authority (ACRA) reveal that GASF Interholdco owns over 98% of GASF's outstanding shares.[16] As majority shareholder of GASF, GASF Interholdco clearly possesses the "practical ability," if not the legal right, to obtain any responsive evidence held by GASF.[17]

### B.     The Discovery Sought Is "For Use" In a Foreign Proceeding.

To establish that the information sought is "for use" in a foreign proceeding, Petitioners must merely show that they have "the procedural right to submit the requested documents to" the foreign tribunal.  *In re Accent Delight Int'l Ltd*., 869 F.3d at 132.  A Section 1782 petitioner is not required to demonstrate that the information sought would be discoverable or admissible in the foreign proceedings.  *Brandi-Dohrn* 673 F.3d at 82  ("as a district court should not consider the discoverability of the evidence in the foreign proceeding, it should not consider the admissibility of evidence in the foreign proceeding in ruling on a section 1782 application").  Instead, the district court considers "the *practical ability* of an applicant to place a beneficial document—or the information it contains—before a foreign tribunal."  *In re Accent Delight Int'l Ltd.*, 869 F.3d at 131 (emphasis added); *Mees*, 793 F.3d at 298 ("for use" element satisfied if materials sought can "be employed with some advantage or serve some use in the proceeding").

Cayman Courts will accept and consider any relevant evidence submitted by the parties, so

---

[16] *See* Loft. Decl. Ex. 30.

[17] Furthermore, GA LLC, GAP Bermuda III, GAP Bermuda IV, GAPCO III, GAPCO IV, GAPCO, and GAPCO CDA also exert possession, custody, and control over GASF by virtue of the fact that these entities "contributed the capital to GASF Interholdco to fund GASF's purchases of the ADS and *may direct GASF Interholdco with respect to its shares of GASF*" and "*GA LLC is the managing member* of GAPCO III, GAPCO IV and GAPCO V and is the general partner of GAPCO CDA."  Loft Decl., Ex. 28 (58.com Inc., SEC Schedule 13D (June 23, 2017), at 15).

18

long as it is lawfully obtained in the jurisdiction in which it originates and not otherwise subject to an exclusionary rule of evidence.  *See* Mangatal Decl. ¶ 65.  Cayman Courts have emphasized the need to consider all facts and matters which may have a bearing on the determination of fair value. *See id.* ¶ 37 (citing *Qihoo 360 Technology Co., Ltd.,* (unreported, October 9, 2017 CICA) ("The sole task of the Court is to determine the fair value of the dissenters' shares.  To do that, it needs full information.")).  The Cayman Court will undoubtedly accept and consider the Requested Discovery given its relevance in determining the fair value of Petitioners' 58.com shares.  *Id.* ¶ 66.

Finally, the Requested Discovery is intended for use in the Appraisal Proceeding, which was filed on November 10, 2020.  Kish Decl. ¶ 28.  The Requested Discovery is therefore plainly "for use" in the Appraisal Proceeding, and Petitioners have thus satisfied the second statutory requirement.  *See In re Appl. of Temporary Services Ins. Ltd.*, 2009 WL 2843258, at *2 (W.D.N.Y Aug. 28, 2009) (finding discovery sought for use in Cayman proceeding satisfied this prong).

### C.    Petitioners Are "Interested Persons."

"Litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782."  *Intel*, 542 U.S. at 256; *Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*, 785 F.Supp. 2d 434, 256 (S.D.N.Y. 2011) ("No doubt litigants are included among . . . the interested persons who may invoke § 1782.") (quoting *Intel*, 542 U.S. at 256).  Because Petitioners are claimants in the Appraisal Proceeding, Kish Decl. ¶ 2, they are "interested persons."  All of the statutory elements are thus satisfied here.

## II.    **The *Intel* Discretionary Factors Weigh in Favor of Granting Discovery.**

Once the statutory threshold requirements of Section 1782 are met, a district court considers, in its discretion, whether to order the requested discovery.  To do this, the district court looks to the four "*Intel* factors."  *See Intel*, 542 U.S. at 264; *see also Mees*, 793 F.3d at 298.  As noted above, these factors are: (1) whether the person from whom discovery is sought is a

"nonparticipant in the matter arising abroad"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance;" (3) whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States;" and (4) whether the request is "unduly intrusive or burdensome."  *Intel*, 542 U.S. at 264–65.  Each of the *Intel* factors weighs in favor of granting the Application.

### A.      Respondents Are Non-Participants in the Appraisal Proceeding.

The first *Intel* factor asks whether the party from whom discovery is sought is a party to the foreign proceeding.  The reason for this inquiry is because "when the person from whom discovery is sought is a participant in the foreign proceeding . . . the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad."  *Intel*, 542 U.S. at 264.

Respondents are not a party in the Appraisal Proceeding, and therefore will not be subject to party discovery in the Appraisal Proceeding.   Mangatal Decl. ¶ 42.   Further, because Respondents reside in the United States, the Cayman Court will not have jurisdiction to compel discovery from them.  *Id*.  Petitioners, therefore, will not be able to take discovery of Respondents through the Appraisal Proceeding, even though evidence from Respondents is crucial to the fair resolution of the dispute.   Accordingly, this first *Intel* factor weighs in favor of granting the Application.  *Intel*, 542 U.S. at 256 ("[W]hen the person from whom discovery is sought is a participant in the foreign proceeding . . . , the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad."); *In re Top Matrix Holdings, Ltd.*, 2020 WL 248716, at *5 (S.D.N.Y. Jan. 16, 2020) ("[T]hat information possessed by Credit Suisse USA is also likely possessed by Credit Suisse in Switzerland is not relevant" when "neither is within the jurisdiction of the Swiss courts.").

**B.      The Cayman Islands Court Will Be Receptive to the Evidence Sought.**

The second *Intel* factor requires courts to consider whether the "nature, attitude, and procedures" of the foreign tribunal indicate that it is receptive to Section 1782 assistance.  Notably, there is a strong presumption that foreign tribunals will be receptive to evidence obtained under Section 1782, and thus the burden is placed on the party opposing discovery to show that a foreign tribunal would reject the evidence obtained through 1782.  *See Euromepa, S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100 (2d Cir. 1995); *In re Appl. of Auto–Guadeloupe Investissement S.A., for an Order to Take Discovery Pursuant to 28 U.S.C. Section 1782*, No. 12 MC 221 (RPP), 2012 WL 4841945, at *6 (S.D.N.Y. Oct. 10, 2012).  Absent authoritative proof that the foreign tribunal would reject evidence obtained through Section 1782, courts are inclined to grant the application for discovery.  *See In re Appl. of OOO Promnefstroy for an Order to Conduct Discovery for Use in a Foreign Proceeding*, No. M 10-99 (RJS), 2009 WL 3335608, at *7 (S.D.N.Y. Oct. 15, 2009).

Cayman courts will consider any evidence that has a bearing on determining the fair value of a company's shares.  *See* Mangatal Decl. ¶ 65.  Moreover, as set forth in the Mangatal Declaration, Cayman courts have specifically held that it is permissible to use a Section 1782 application to obtain discovery for use in Cayman Islands proceedings.  *See id*. ¶ 49.  Indeed, the Cayman Court of Appeal has expressly held that the right to obtain full discovery, including pre-trial deposition testimony, "is a right conferred by U.S. law—it is not a right conferred by, or *to be withheld under Cayman law*." *id.* ¶ 55 & Ex. 7.

Further, multiple United States courts have recognized that Cayman Islands courts are receptive to evidence obtained through Section 1782.  *See In re Platinum Partners Value Arbitrage Fund L.P.*, 583 B.R. 803, 816 (Bankr. S.D.N.Y. 2018) ("Liquidators present unrebutted evidence that, far from being hostile to Cayman litigants seeking evidence under U.S. law, Cayman courts are in fact receptive to evidence obtained through U.S. discovery procedures, even if such evidence

may not be discoverable under Cayman law."); *see also Gushlak v. Gushlak*, 486 F. App'x 215, 218 (2d Cir. 2012) (affirming use of Section 1782 applications in connection with Cayman divorce proceedings); *Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd*., 785 F. Supp. 2d 434, 439 (S.D.N.Y. 2011) (granting Section 1782 applications seeking documents for use in Cayman proceedings); *In re Penner*, 2017 WL 5632658, at *3 (D. Mass. Nov. 22, 2017) (finding that the Cayman Court "is open to receiving § 1782 discovery").  Indeed, two district courts recently granted 1782 petitioners' applications for both document discovery and a deposition for use in an appraisal proceeding in the Cayman Islands.  *See In re Application of Athos Asia Event Driver Master Fund*, No. 4:21-MC-00153-AGF, 2021 WL 1611673, at *1 (E.D. Mo. Apr. 26, 2021) ("There is no indication in the record here that a discovery order would be unwelcome by the Cayman Islands court."); *In re Application of Athos Asia Event Driven Master Fund*, No. 1:21-MC-00208-GBF, ECF 8 (S.D.N.Y. Mar. 3, 2021) (granting 1782 petition for discovery for use in Cayman appraisal proceeding).

### C.     Petitioners Are Not Circumventing Foreign Proof-Gathering Restrictions.

The third *Intel* factor looks to "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States."  *Intel*, 542 U.S. at 265.  Importantly, the third *Intel* factor is satisfied unless the foreign court actively prohibits the petitioner from gathering the information sought.  *Brandi-Dohrn* 673 F.3d at 82  ("as a district court should not consider the discoverability of the evidence in the foreign proceeding, it should not consider the admissibility of evidence in the foreign proceeding in ruling on a section 1782 application"); *Intel*, 542 U.S. at 261 ("A foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions—reasons that do not necessarily signal objection to aid from United States federal courts.").  In addition, there is no "quasi-exhaustion requirement," *i.e.*, a requirement that petitioner first seek the

discovery in a foreign court.  *In re Metallgesellschaft AG*, 121 F.3d 77, 79 (2d Cir. 1997); *In re Appl. of Imanagement Servs. Ltd.*, No. Misc. 05-89 (FB), 2005 WL 1959702, at *5 (E.D.N.Y. Aug. 16, 2005) (same).  The discovery sought does not attempt to circumvent any proof-gathering restrictions in the Cayman Islands.  To the contrary, as Judge Mangatal explains, "Cayman courts expect the parties to obtain the evidence they believe is necessary to prosecute their case" and "[t]hus there is no requirement to obtain permission from a Cayman court before seeking relevant evidence abroad."  Mangatal Decl. ¶ 65.  The Cayman Islands Court of Appeal has expressly held that "*prima facie* a party who can invoke the jurisdiction of the US District Court under § 1782 may choose to do so."  *See* Mangatal Decl. ¶ 55.

### D.     The Subpoenas Are Not Unduly Burdensome.

The final *Intel* factor looks to whether the discovery requests are "unduly intrusive or burdensome."  *Intel*, 542 U.S. at 265.  The standard is substantially the same as in ordinary domestic civil litigation under the Federal Rules of Civil Procedure.  *See In re Bayer AG*, 146 F.3d 188 at 195 (3d Cir. 1998) ("The reference in § 1782 to the Federal Rules suggests that under ordinary circumstances the standards for discovery under those rules should also apply when discovery is sought under the statute."); *Valle Ruiz*, 939 F.3d at 532–33 ("[T]he text of § 1782 authorizes discovery pursuant to the Federal Rules of Civil Procedure").

### 1.     The Subpoenas Are Properly Limited in Scope.

Here, the Subpoenas are narrowly tailored both with respect to the time period and subject matter of the requests.  *First*, the Subpoenas are limited to documents and information directly relevant to three relevant issues in the Appraisal Proceeding—(a) the actions taken by Respondents as members of the Buyer Group; (b) the valuation of the Company; and (c) any relationship between the Respondents and the members of the Special Committee that approved the transaction.  *See* Mangatal Decl. ¶ 17.  In a recent appraisal decision, the Cayman Court expressly referred to

the 2,900 documents produced in a Section 1782 proceeding by Houlihan Lokey, an entity that, unlike here, was not a direct participant to the relevant transaction but an advisor to the Special Committee that approved it.  Mangatal Decl. ¶ 58.  The court found that discovery was "obviously relevant to advancing a reasoned critique of Houlihan Lokey's DCF analysis."  *Id.*  Thus, particularly given the more significant role played by Respondents here, there can be no serious dispute as to the relevance of the discovery sought.

*Second*, the discovery requests are also temporally limited to the period during which the 58.com board has reported in public filings that it was negotiating the transaction with the Buyer Group.  *See In re Gushlak*, No. 11–MC–218 (NGG), 2011 WL 3651268, at *6 (E.D.N.Y. Aug. 17, 2011) (holding that a Section 1782 request, like any other discovery request, is "reasonably calculated to lead to relevant matter if there is any possibility that the information sought may be relevant to the subject matter of the action") (emphasis in original); *First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 23 (2d Cir. 1998) (finding reasonableness of subpoena that only sought documents which concern "the precise subject matter of the underlying [proceedings]").

*Third*, Petitioners are willing to meet and confer with Respondents to address any scope or burden concerns.  And if the Court has any remaining concerns about undue burden, granting the Application will not preclude Respondents "from contesting the subpoena[s] (including a motion to quash or modify)" the discovery sought.  *Strike 3 Holdings, LLC v. Doe*, No. 20–cv–7923 (LJL), 2020 WL 5992346, at *2 (S.D.N.Y. Oct. 9, 2020); *In re Letter of Request from Supreme Ct. of Hong Kong*, 138 F.R.D. 27, 32 n.6 (S.D.N.Y. 1991).  If the Court agrees, "it is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief outright."  *Euromepa, S.A*, 51 F.3d at 1101.

24

2.      A Rule 30(b)(6) Deposition Is Appropriate Here.

District courts have typically been "generous" in granting Rule 30(b)(6) depositions in

Section 1782, even in cases with "tight schedule[s]" and other potential difficulties.  *In re Ex Parte*

*Application of Porsche Automobil Holding SE*, No. 15-MC-417 (LAK), 2016 WL 702327, at *13

(S.D.N.Y. Feb. 18, 2016) (permitting 30(b)(6) deposition despite "tight schedule" because it was

"relatively evident from precedent in this circuit generous to Section 1782 applicants that there

was a reasonable chance they would have to produce documents and prepare witnesses on a short

timetable"); *In re Mother's Milk, Inc.*, No. 5:20–MC-00004–M, 2020 WL 2514315, at *5

(S.D.N.Y. May 15, 2020) (permitting 30(b)(6) deposition because it would "provide helpful

evidence to the [foreign] court in moving the case forward."); *In re Accent Delight Int'l Ltd*., 2018

WL 2849724  (same).  Given the role that Respondents played in this matter, 30(b)(6) depositions

of corporate representatives are appropriate and will significantly aid the Cayman Court.

## III.     Expedited Compliance with the Subpoenas Is Warranted.

In the event the Court grants Petitioners' Application, Petitioners respectfully request that

the Court direct Respondents to produce responsive documents within 30 days of service and

submit to a deposition on a mutually agreeable date within a reasonable time after Respondents'

confirmation of final production of documents.  Expedition of this Application and Respondents'

time to comply with the Subpoenas will permit sufficient time for (a) this Court's resolution of

Petitioners' Section 1782 Application and any objections to the Subpoena; (b) Respondents'

collection, review, and production of responsive documents; (c) Petitioners' counsel's review of

documents produced by Respondent; and (d) Petitioners' timely submission of relevant documents

to the court.  This expedition is important given that relevant evidence is expected to be made

available to the experts retained by the Dissenting Shareholders in the Appraisal Proceeding

beginning in September 2021.

## **CONCLUSION**

Petitioners respectfully request that the Court grant their Application.

Dated: July 23, 2021

By:   */s/ Duane L. Loft*

        BOIES SCHILLER FLEXNER LLP
        Duane L. Loft
        Brianna S. Hills
        55 Hudson Yards
        New York, NY 10001
        Telephone: (212) 446-2300
        Facsimile: (212) 446-2380
        dloft@bsfllp.com
        bhills@bsfllp.com

        LABATON SUCHAROW LLP
        Ira A. Schochet
        140 Broadway
        New York, NY 10005
        Telephone: (212) 907-0864
        ischochet@labaton.com

        GRANT & EISENHOFER P.A.
        Christine Mackintosh (*pro hac vice* application
        forthcoming)
        123 S. Justison Street
        Wilmington, DE 19801
        Telephone: (302) 622-7081
        cmackintosh@gelaw.com

        *Attorneys for Petitioners*